Cause No. 09-16469



| | | |
|---|---|---|
| FASTWING INVESTMENT HOLDING LTD.; and ALBATROSS COMMERCIAL LTD | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | |
| BOMBARDIER, INC.; BOMBARDIER, INC. d/b/a BOMBARDIER AEROSPACE; BOMBARDIER AEROSPACE CORPORATION ; and LEARJET INC. | § § § § § | DALLAS COUNTY, TEXAS |
| Defendants. | § § § | 160th JUDICIAL DISTRICT |



## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs Albatross Commercial Ltd. ("Albatross") and Fastwing Investment Holding Ltd. ("Fastwing") file this Original Petition against Bombardier, Inc.; Bombardier, Inc. d/b/a Bombardier Aerospace; Bombardier Aerospace Corporation; and Learjet Inc. (referred to collectively as "Defendants") and for cause of action respectfully shows the Court as follows:

**I.    Discovery Level:**

1.1    This case will be governed by a Level III discovery control plan.

**II.    Parties:**

2.1    Plaintiff Albatross Commercial Ltd. is a corporation organized under the laws of the British Virgin Islands. Albatross' principal place of business is in the British Virgin Islands. Albatross is registered to do business in the State of Texas as Albatross Commercial Ltd.

2.2    Plaintiff Fastwing Investment Holding Ltd. is a corporation organized under the laws of the British Virgin Islands. Fastwing's principal place of business is in the British Virgin Islands. Fastwing is registered to do business in the State of Texas as Fastwing Investment Holding Ltd.

---

**PLAINTIFFS' ORIGINAL PETITION**                                      Page 1

EXHIBIT "A"

2.3     Defendant Bombardier Aerospace Corporation is a Texas corporation.   Its principal place of business is 3400 Waterview Parkway, Suite 400, Richardson, Texas 75080. Bombardier Aerospace Corporation may be served by serving its registered agent for service of process—CT Corporation System, 350 North St. Paul St, Dallas, Texas, 75201.

2.4     Defendants Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace are corporations organized and existing under the laws of Canada, with their principal place of business in Quebec, Canada.   Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace are nonresidents who regularly engage in business in Texas and who claim not to maintain a regular place of business in Texas and have not designated a registered agent for service of process in Texas. Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace may be served with process through the Hague Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.   Citation should be issued to Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace at 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8.   Additionally, the Defendant may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701.   The Texas Secretary of State may serve Defendant Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace at 800 Rene-Levesque Blvd. West, Montreal, Quebec, Canada H3B 1Y8.

2.6     Defendant Learjet Inc. is a Delaware corporation.   Defendant Learjet Inc.'s principal place of business is at 7336 Aviation Place, Dallas, Texas 75235.   Learjet Inc. was served with process by serving its registered agent for service of process—CT Corporation System, 350 North St. Paul St, Dallas, Texas, 75201.

2.7     Upon information and belief, Plaintiffs allege that Bombardier, Inc. and Bombardier Inc. d/b/a Bombardier Aerospace carry out their operations in Texas, throughout the United States, and throughout the world through various agents, servants, employees, partners, joint ventures, alter egos and/or does business as the following:   Bombardier Aerospace, Bombardier Aircraft Services, Business Aircraft Services, Bombardier Business Jet Solutions,

---

**PLAINTIFFS' ORIGINAL PETITION**                                                              Page 2

Bombardier Aerospace Corporation, Bombardier Corporation, Bombardier Aviation Services, Business Aviation Services, Bombardier Business Aircraft, Learjet Inc., and/or Bombardier Business Aviation Services. Upon information and belief, Plaintiffs allege that at all material times all Defendants were the agents, servants, and employees, partners and/or joint venturers of every other Defendant and the acts of each Defendant were within the course and scope of their agency and/or employment and/or joint venture.

## III.   Jurisdiction & Venue:

3.1   Venue is proper in this forum because the cause of action accrued in whole or in part in Dallas County, Texas. The amount sought by Plaintiffs is within the jurisdictional limits of this Court. This Court has personal jurisdiction over Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace because: 1) they do business within the State of Texas; 2) they have systematic and continuous contacts with the State of Texas; 3) Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace and their subsidiaries maintain multiple offices in the State of Texas, including offices in Collin and Dallas Counties; 4) Bombardier, Inc. and Bombardier, Inc. d/b/a Bombardier Aerospace have bank accounts and other property located within the state; and 5) at least a portion of the events that give rise to this cause of action occurred in Texas.

3.2   This Court has personal jurisdiction over Bombardier Aerospace Corporation because: 1) it is a Texas corporation; 2) it does business within the State of Texas; 3) it has systematic and continuous contacts with the State of Texas; 4) it maintains an office in the State of Texas; and 5) has property existing within the state; and 6) at least a portion of the events that give rise to this cause of action occurred in Texas.

3.3   This Court has personal jurisdiction over Learjet Inc. because: 1) its principal place of business is in Texas; 2) it has systematic and continuous contacts with the State of Texas; 3) it maintains an office in the State of Texas; and 4) at least a portion of the events that give rise to this cause of action occurred in Texas.

Dec 11 2009 11:21am   DALLAS COUNTY RECORDS   Fax:2146537966   P004/023

**IV.**   **Facts:**

    **A.**   **The Sky Capital Global 5000 Aircraft:**

    4.1    In 2004, Defendants entered into negotiations with representatives of Sky Capital, in an effort to sell a Bombardier Global 5000 business jet aircraft (serial number 9168) (referred to within this petition as the "Global 5000"). Sky Captial is related to Fastwing and Albatross through common directors and a common owner representative. Defendants represented themselves as an aircraft manufacturer with extensive experience and knowledge in the customization of jet aircraft and their interiors for use as luxury air transportation. Defendants knew that Sky Capital was in the market to obtain a jet aircraft for use in its business operations, which included using the jet in luxury-air-charter operations.

    4.2    Following negotiations by and between Defendants and Sky Capital, the Parties entered into a written Aircraft Purchase Agreement (the "Global 5000 Purchase Agreement"), together with aircraft completion specifications, a customer support services manual, interior completion requirements, and specific warranty agreements. The purchase price of the Aircraft was $32,650,000.00. Pursuant to the terms of the Global 5000 Purchase Agreement, Defendants promised that they would adhere to a specified time schedule with regard to manufacturing the aircraft and delivering the aircraft to Sky Capital. Bombardier required that at least partial performance of the Global 5000 Purchase Agreement would occur in Texas and did occur in Texas.

    4.3    In 2006, Defendants produced and delivered the Global 5000 to Sky Capital. At that time, the Aircraft had not yet undergone exterior painting or interior modifications and finishing. This type of unfinished aircraft is commonly referred to as a "green aircraft." Sky Capital was asked to inspect the Aircraft, flight test the Aircraft, and prepare a list of deficiencies and discrepancies regarding the Aircraft's condition. Those deficiencies and discrepancies were to be repaired by the Defendants pursuant to an agreed time schedule.

    4.4    As part of the negotiations leading up to the preparation of the Global 5000 Purchase Agreement, Sky Capital advised the Defendants that it desired a number of specific,

luxury modifications and improvements to the passenger cabin along with the installation of various accessories (collectively referred to as "the Modifications"). Defendants understood and acknowledged this intention. The Modifications were a material part to the aircraft purchase agreement and to the aircraft manufacturing process. Defendants specifically promised and represented that they would make the modifications to the passenger cabin in a timely and first-class manner.

4.5    The Parties then entered into a specific supplement to the Global 5000 Purchase Agreement entitled "Confidential SKP Modifications to Limited Edition Completion Specification" ("the Interior Modification Agreement"). Sky Capital paid additional consideration in excess of $1,000,000.00 in connection with the Interior Modification Agreement. Defendants represented that they would make the Modifications in a timely and first-class manner. Defendants further represented that Sky Capital would have the right and opportunity to reasonably approve all of the Modifications and that Defendants would adhere to a specific time schedule in rectifying any deficiencies or discrepancies discovered by Sky Capital after the completed Aircraft was delivered. Defendants understood, represented and promised to Sky Capital that they recognized the importance of the Modifications in light of the intention to operate the Global 5000 as a luxury-air-charter aircraft.

4.6    In 2006, Sky Capital completed a flight inspection of the Global 5000 and provided Defendants with a list of deficiencies and discrepancies. Defendants thereafter took possession of the Aircraft to repair the deficiencies and discrepancies and to make the agreed-upon Modifications. Defendants represented to Sky Capital that all of the referenced deficiencies and discrepancies had been rectified and that the Modifications were complete. The Global 5000 was then delivered to Sky Capital as "fully completed."

4.7    Shortly after taking possession of the Global 5000, Sky Capital discovered that in fact, the modifications were done incorrectly or not at all. From September 2006 – November 2006, Sky Capital notified Defendants that the following discrepancies and deficiencies existed with regard to the purported modifications made to the aircraft cabin:

**PLAINTIFFS' ORIGINAL PETITION**                                    Page 5

- substandard fabrics and accessories were installed; .
- air show monitors were inoperative or malfunctioning;
- cabin carpeting was the wrong color and in poor condition;
- incorrect sinks were installed in the cabin;
- power control units were installed in incorrect areas in the cabin;
- the microwave compartment was not adequately fireproofed;
- a power bus was improperly split from two converters for various cabin accessories;
- chairs and other seating was incorrectly designed, improperly manufactured, and incorrectly installed; and
- lights in the cabin were miss-configured and improperly installed.

4.8    These acts were below the industry standard of care and, further, violated the Global 5000 Purchase Agreement and the client specifications of the Interior Modification Agreement.

4.9    Defendants promised and represented to Sky Capital that they would repair all of the deficiencies, and "Outstanding Delivery Items" or "ODIs." Furthermore, when Sky Capital experienced other non-interior, décor-related deficiencies with the aircraft, Defendants once again specifically promised and represented to Sky Capital that they would review all information related to those deficiencies and take prompt action to repair them at one of Defendants' repair facilities.    Defendants also specifically represented, in separate communications with Sky Capital, after the defects were discovered and reported, that the Defendants would repair all deficiencies on a timely basis and according to Sky Capital's specifications.  The Defendants induced Sky Capital to take the aircraft with all of the defects and ODIs with the promise that they would be timely repaired and corrected.  To the contrary, Defendants had no intention of repairing or correcting the defects or ODIs.

---

**PLAINTIFFS' ORIGINAL PETITION**                                                    Page 6

4.10    Commencing in November 2006 and continuing until the present, Defendants engaged in a series of delaying and dilatory actions, representing to Sky Capital that Defendants would remedy the defects in accordance with their pre-contract representations and in compliance with the Interior Modification Agreement. Defendants specifically warranted and represented that they would make all interior aircraft cabin repairs and changes at any time up to 2,000 flight hours or two years (whichever was earlier) from delivery of the Aircraft. Despite Defendants' numerous oral and written promises to Sky Capital, Defendants have failed to take any meaningful action to repair or correct the defects.

4.11    Following the discovery of the cabin deficiencies, Sky Capital experienced serious problems regarding the airworthiness of the Global 5000 and its components. The Global 5000 Purchase Agreement between Sky Capital and Defendants contains a specified manufacturer's warranty. That warranty promises that at the time of delivery, the Aircraft would be free of all defects in design or manufacture and that, in the event there were any problems with the Aircraft or any of its structural component parts, Defendants would repair, replace, and rework the deficiencies. The warranty as to structural and flight operating characteristics required the Defendants to make repairs after delivery of the Global 5000.

4.12    Sky Capital has indentified and reported to Defendants the following additional defects, among others, with the Global 5000, which are subject to either the interior Aircraft cabin repair/replacement or structural warranty repair:

- cockpit glare shield camera inoperative;
- forward aircraft water system leaks;
- lavatory water overflows;
- Aircraft galley sink drain malfunctions;
- EIB water system switches turning on and off without input;
- forward Aircraft toilet flushing by itself;
- DVD player inoperative;

- potable water system for passengers drains out during flight;
- ADC-1 temperature malfunctions;
- APU battery voltage malfunctions;
- defective cockpit touch screen Air Show display vector;
- SATCOM avionics system plays two stations when set to one position;
- Aircraft telephone system intermittently cuts out;
- window shades inoperative;
- switch panels inoperative;
- cabin call bells inoperative;
- defective lights;
- conference group arm rest inoperative;
- aft toilet vacuum compressor runs continuously;
- plug in monitor defective and causes power circuit breaker to trip;
- lavatory mirror and wash lights are inoperative;
- continuous pack fault at start of descent;
- entertainment control unit and passenger control units inoperative;
- cabin touch screens do not properly control entertainment equipment; and
- telephone portable charger inoperative.

4.13    Since October 2006, Defendants have engaged in a pattern of evasion and deception concerning their promises to comply with their pre-contract representations and their obligations to repair the Global 5000. This conduct has included misrepresenting to Sky Capital that Defendants would make the necessary corrections and repairs when, in fact, they never intended to do so. Some of Defendants' misleading and deceitful conduct included statements that Defendants would take possession of the Global 5000 and repair all of the defects. Despite

---

ƐZ0/600d  ɯɐᄅᄅ:ⱢⱢ 600Z ⱢⱢ ɔǝ◌        996Ɩ∠ƐϛϛᔭⱢᄅ:xɐℲ SꓷɹOƆƎꓤ ⅄⊥NՈOƆ SⱯ⅂⅂Ɐꓷ

such promises and their obligations, Defendants have continued to delay the commencement of the repairs based upon deceitful grounds, including but not limited to, representing to Sky Capital that new schematic drawings or blueprints had to be prepared and new component parts had to be manufactured by subcontractors before the Aircraft could be taken to a facility to effect repairs. For more than a year and a half, Defendants have provided Sky Capital with various schematic drawings and other specifications designed to convince Sky Capital that Defendants were commencing the repair process when, in fact, they had no intention of doing so and, instead, were waiting for the warranty period to expire. After receiving approval and further instructions from Sky Capital more than one year ago, Defendants have still failed to repair the numerous defects in the condition of the Aircraft.

**B.**   **The Albatross & Fastwing XRS Aircraft:**

4.14   Sometime in 2006, Bombardier began negotiations with representatives of Albatross and Fastwing regarding a new program Bombardier was promoting. Bombardier presented those representatives with the opportunity to purchase additional, upgraded aircraft with the assurance that those purchases would be completed without delay and that the aircraft would be of a superior quality than the Global 5000. Bombardier knew that those representatives were in the market to purchase two additional aircraft for Albatross and Fastwing.

4.15   Based on Bombardier's promises and representations, Fastwing and Albatross engaged in negotiations to purchase two new Global Express XRS aircraft. On November 30, 2006, Albatross signed "Aircraft Purchase Agreement #1-2006" for the purchase of a Global Express XRS aircraft (the "Albatross Purchase Agreement"). A partial copy of the Albatross Purchase Agreement is attached to this petition as "Exhibit A." The purchase price was $41,000,000.00. The first payment of $4,000,000.00 was due upon Albatross's execution of the

---

Dec 11 2009 11:22am    DALLAS COUNTY RECORDS  Fax:2146537966                    P010/023

agreement.   In accordance with Bombardier's instructions, Albatross performed under the purchase agreement by making the $4,000,000.00 payment to Bombardier's bank account in Dallas, Texas.  The aircraft purchase agreement required Bombardier to manufacture the aircraft and present the green aircraft for Albatross' inspection and acceptance within 90 days of April 30, 2009 and to deliver the completed aircraft within 45 days of December 31, 2009.

4.16   On November 30, 2006, Fastwing signed "Aircraft Purchase Agreement #2-2006" for the purchase of a Global Express XRS aircraft (the "Fastwing Purchase Agreement").  A partial copy of the Fastwing Purchase Agreement is attached to this petition as "Exhibit B."  The purchase price was $41,500,000.00.    The first payment of $4,000,000.00 was due upon Fastwing's execution of the agreement.  In accordance with Bombardier's instructions, Fastwing made that payment to Bombardier's bank account in Dallas, Texas.  The Fastwing Purchase Agreement required Bombardier to present the green aircraft for Fastwing's inspection and acceptance within 90 days of May 31, 2009 and to deliver the completed aircraft within 45 days of January 31, 2010.

4.17   Bombardier has not kept the promises it made to induce Fastwing and Albatross to enter into the aircraft purchase agreements, and Bombardier has failed to comply with the terms of the agreements.  In accordance with its pattern and practice which began with the Global 5000, Bombardier has repeatedly delayed its performance under the terms of the agreements.  Bombardier informed Fastwing and Albatross that it will not be prepared to deliver the green aircraft until September 2010 and August 2010 respectively, and it will not be ready to deliver their completed aircraft until 2011.  Such late delivery is a violation of material terms of the aircraft purchase agreement.

<u>**PLAINTIFFS' ORIGINAL PETITION**</u>                                                                        Page 10

4.18   On July 24, 2009, after informing Albatross and Fastwing that Bombardier would

be unable or unwilling to perform under the terms of the agreements, Bombardier sent Plaintiffs'

a "demand for adequate assurances of performance." In that letter, Bombardier demanded that

Plaintiffs assure Bombardier that Plaintiffs would not terminate the agreements due to

Bombardier's failure to comply with the material terms of the contracts and demanded that

Plaintiffs amend this suit and withdraw their requests for rescission of the agreements.   On

August 21, 2009, Albatross and Fastwing responded to Bombardier's "demand for adequate

assurances." Albatross and Fastwing again informed Bombardier that its failure to deliver the

aircraft in compliance with the agreements was a breach of material terms of the agreements and

notified Bombardier that, since Bombardier admitted that it cannot cure its breach of the

agreements, Albatross and Fastwing are terminating the agreements. In accordance with Articles

9.2 and 9.3 of the agreements, Albatross and Fastwing demanded Bombardier return the $8

Million previously paid by Albatross and Fastwing together with interest.

4.19   Articles 9.2 and 9.3 are identical in both the Albatross and Fastwing agreements,

and state as follows:

9.2   Buyer may terminate this Agreement before Delivery Time if Seller is in
default or breach of any material term or condition of this Agreement and
does not act to cure such default or breach within 10 days after receipt of
written notice from Buyer specifying such default or breach and does not
continue thereafter to diligently correct or cure the alleged default or
breach.

9.3   Upon termination of this Agreement by Buyer pursuant to and in
accordance with this Article 9 all amounts received by Seller on account
of the Purchase Price (less, if applicable, any amount otherwise paid to
Buyer following exercise of its rights under the Letter of Credit) shall, also
subject to Article 12.3, be reimbursed to Buyer within five (5) business
days from the date of receipt of the termination notice together with
interest calculated at the rate described in Article 6.2 plus three percentage
point [sic] (3%) from and including the date each payment was received

DALLAS COUNTY RECORDS   Fax:2146537966                Dec 11 2009 11:22am   P012/023

by Seller until and including the date such payment is reimbursed to Buyer. . . .

4.20    Bombardier did not respond to Albatross' and Fastwing's request for return of the $8 Million paid as a deposit for the aircraft, nor did it act to cure its default and breach of the agreements.   On October 2, 2009, Albatross and Fastwing again demanded that Bombardier return the $8 Million together with interest pursuant to the terms of the agreements.  Bombardier never responded to Albatross' and Fastwing's repeated requests for the return of their deposits. Bombardier has never returned the deposits.

4.21    Defendants have engaged in an ongoing pattern and practice of evasion and deception concerning their pre-contract promises and representations and their fulfillment of their obligations to manufacture and deliver the Albatross and Fastwing XRS aircraft in compliance with the purchase agreements.   This conduct has included misrepresenting to Albatross and Fastwing that Defendants were capable of and willing to meet the deadlines established in the agreements when, in fact, they never intended to do so.  Despite their promises and obligations, Defendants have continued to delay their performance under the agreements based upon deceitful grounds.   For nearly three years, Fastwing and Albatross supplied Defendants with all specifications necessary to enable the Defendants to deliver the aircraft in conformity with the purchase agreements in reliance upon Bombardier's promises and representations that it would perform.   Despite such promises and representations, Defendants have failed to comply with the terms of the agreements, which proximately caused substantial damage to Fastwing and Albatross.  And, even after admitting that it cannot and will not meet the delivery terms of the agreements, Bombardier refuses to return the $8 Million in deposits paid by Albatross and Fastwing in accordance with Bombardier's prior representations.

**PLAINTIFFS' ORIGINAL PETITION**                                            Page 12

## V.    Causes of Action:

### A.    Fraud:

5.1     Plaintiffs refer to and incorporate the allegations contained in paragraphs 1.1 through 4.21 of this petition by reference as if set forth fully here.

5.2     Albatross and Fastwing are informed and believe that Defendants have engaged in a systematic, deliberate and premeditated pattern and practice designed to avoid their obligations to deliver the XRS aircraft in compliance with the terms of the aircraft purchase agreements. Despite their numerous representations regarding their promises to deliver and their progress towards delivery of the XRS aircraft, Defendants have resorted to various deceitful excuses including Defendants' inability to finalize the design specifications and obtain information necessary to complete the design.

5.3     The representations made by the Defendants were material, and they were false. And, Defendants knew the representations were false when they made them, and/or they made them recklessly, without knowledge of their truth. The Defendants made the representations to entice Albatross and Fastwing to purchase the XRS aircraft and to induce them to pay the Defendants large deposits on the aircraft despite Bombardier's knowledge that it could not and would not comply with the delivery terms in the purchase agreements. Thus, Defendants made the representations with the intent that Albatross and Fastwing would act on them. Albatross and Fastwing relied upon Defendants' representations. Had Albatross and Fastwing known of the falsity of the representations, they would not have purchased the XRS aircraft under the existing terms and conditions.

5.4     Defendants' misrepresentations proximately caused injury to Plaintiffs.

Dec 11 2009 11:23am P014/023            2146537966:xaF  SDROCER YTNUOC SALLAD

**B.**   **Fraud in the Inducement:**

5.5     Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.4 of this petition as if set forth fully here.

5.6     Sometime in 2006, Bombardier began negotiations with representatives of Albatross and Fastwing regarding a new program Bombardier was promoting. Bombardier presented those representatives with the opportunity to purchase additional, upgraded aircraft with the assurance that those purchases would be completed without delay and that the aircraft would be of a superior quality than the Global 5000. Bombardier knew that those representatives were in the market to purchase two additional aircraft for Albatross and Fastwing due to Bombardier's ongoing negotiations with those same representatives with reference to the Global 5000 aircraft.

5.7     Based on Bombardier's representations, Fastwing and Albatross engaged in negotiations to purchase two new Global Express XRS aircraft. On November 30, 2006, Albatross signed "Aircraft Purchase Agreement #1-2006" and Fastwing signed "Aircraft Purchase Agreement #2-2006."

5.8     Bombardier has not kept the promises it made to induce Fastwing and Albatross to enter into the aircraft purchase agreements, and Bombardier has failed to comply with the terms of the agreements. In accordance with its pattern and practice which began with the Global 5000, Bombardier has repeatedly delayed its performance under the terms of the agreements. Bombardier has informed Fastwing and Albatross that it will not be prepared to deliver the green aircraft until September 2010 and August 2010 respectively, and it will not be ready to deliver their completed aircraft until 2011.

DALLAS COUNTY RECORDS Fax:2146537966          Dec 11 2009 11:23am P015/023

5.9    Defendants have engaged in an ongoing pattern and practice of evasion and deception concerning their pre-contract representations and their fulfillment of their obligations to manufacture and deliver the Albatross and Fastwing XRS aircraft in compliance with the purchase agreements. This conduct has included misrepresenting to Albatross and Fastwing that Defendants were capable and willing to meet the deadlines established in the agreements when, in fact, they never intended to do so. Despite their obligations, Defendants have continued to delay their performance under the agreements based upon deceitful grounds. For nearly three years Fastwing and Albatross engaged Defendants in an effort to provide any information necessary for the delivery of the aircraft in conformity with the purchase agreements, expecting that Defendants had the will, intention, and ability to do so.

5.10    The representations made by the Defendants were material, and they were false. Defendants knew the representations were false when they made them, and/or they made the representations recklessly, without knowledge of their truth. The Defendants made the representations to entice Plaintiffs to purchase the aircraft and pay the Defendants more money. Thus, Defendants made the representations with the intent that Plaintiffs would act on them. Plaintiffs relied upon Defendants' representations and entered into the agreements with Defendants based upon Defendants' fraudulent misrepresentations. Had Plaintiffs known of the falsity of the representations, they would not have purchased the aircraft under the existing terms and conditions. Defendants' representations to Plaintiffs constituted an ongoing pattern and practice—a continuous fraud against Plaintiffs—designed to entice each of them to enter into a series of purchase agreements for multiple aircraft.

5.11    Defendants' misrepresentations proximately caused injury to Plaintiffs.

DALLAS COUNTY RECORDS Fax:2146537966          Dec 11 2009 11:23am   P016/023

**C.**   **Breach of Contract:**

5.12    Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.11 of this petition as if set forth fully here.

5.13    On November 30, 2006, Fastwing signed "Aircraft Purchase Agreement #2-2006" for the purchase of a Global Express XRS aircraft. The purchase price was $41,500,000.00. The first payment of $4,000,000.00 was due upon Fastwing's execution of the agreement.   In accordance with Bombardier's instructions, Fastwing made part performance under the contract by delivering $4,000,000.00 to Bombardier's bank account in Dallas, Texas. The Fastwing Purchase Agreement required Bombardier to present the green aircraft for Fastwing's inspection and acceptance within 90 days of May 31, 2009 and to deliver the completed aircraft within 45 days of January 31, 2010.

5.14    On November 30, 2006, Albatross signed "Aircraft Purchase Agreement #1-2006" for the purchase of a Global Express XRS aircraft.   The purchase price was $41,000,000.00. The first payment of $4,000,000.00 was due upon Albatross's execution of the agreement.   In accordance with Bombardier's instructions, Albatross made part performance under the contract by delivering $4,000,000.00 to Bombardier's bank account in Dallas, Texas. The aircraft purchase agreement required Bombardier to manufacture the aircraft and present the green aircraft for Albatross' inspection and acceptance within 90 days of April 30, 2009 and to deliver the completed aircraft within 45 days of December 31, 2009.

5.15    Fastwing and Albatross have performed all promises, covenants, and conditions required under the purchase agreements.   However, Defendants breached the purchase agreements by failing to meet the deadlines for performance of their design duties and by failing to properly prepare the aircraft for delivery in conformity with the schedule set out in the

---

purchase agreements. Defendants have further breached the purchase agreements by refusing to comply with articles 9.2 and 9.3 of the agreements and return the $8 Million paid by Albatross and Fastwing as an initial deposit on the aircraft. Such acts are a material breach of the terms of the purchase agreements.

5.16   Defendants' breach of the purchase agreements proximately caused harm to Plaintiffs.

**D.     Repudiation of the Fastwing and Albatross Agreements:**

5.17   Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.16 of this petition as if set forth fully here.

5.18   Sometime in 2006, Bombardier began negotiations with representatives of Albatross and Fastwing regarding a new program Bombardier was promoting. Bombardier presented those representatives with the opportunity to purchase additional, upgraded aircraft with the assurance that those purchases would be completed without delay and that the aircraft would be of a superior quality than the Global 5000. Bombardier knew that those representatives were in the market to purchase two additional aircraft for Albatross and Fastwing due to Bombardier's ongoing negotiations with those same representatives with reference to the Global 5000 aircraft.

5.19   Based on Bombardier's representations, Albatross signed "Aircraft Purchase Agreement #1-2006" for the purchase of a Global Express XRS aircraft on November 30, 2006. The purchase price was $41,000,000.00. Albatross made part performance under the contract by delivering $4,000,000.00 to Bombardier's bank account in Dallas, Texas.

5.20   Based on Bombardier's representations, Fastwing signed "Aircraft Purchase Agreement #2-2006" for the purchase of a Global Express XRS aircraft on November 30, 2006.

---

**PLAINTIFFS' ORIGINAL PETITION**

The purchase price was $41,500,000.00. Fastwing made part performance under the contract by delivering $4,000,000.00 to Bombardier's bank account in Dallas, Texas.

5.21   Bombardier has represented that it is unable or unwilling to deliver the green aircraft in compliance with the deadlines set forth in the aircraft purchase agreements. Bombardier has admitted that it is unable to cure this default and breach of the delivery deadlines which are material terms of the agreements.

5.22   Bombardier has not kept the promises it made to induce Fastwing and Albatross to enter into the aircraft purchase agreements. In accordance with its pattern and practice which began with the Global 5000, Bombardier has repeatedly delayed its performance under the terms of the agreements. Bombardier has informed Fastwing and Albatross that it will not be prepared to deliver the green aircraft until September 2010 and August 2010 respectively, and it will not be ready to deliver their completed aircraft until 2011. Such late delivery is a repudiation of the Fastwing and Albatross purchase agreements.

5.23   Defendants have engaged in an ongoing pattern and practice of evasion and deception concerning their pre-contract representations and their fulfillment of their obligations to manufacture and deliver the Albatross and Fastwing XRS aircraft in compliance with the purchase agreements. This conduct has included misrepresenting to Albatross and Fastwing that Defendants were capable and willing to meet the deadlines established in the agreements when, in fact, they never intended to do so. Despite their obligations, Defendants have continued to delay their performance under the agreements based upon deceitful grounds. For nearly three years Fastwing and Albatross engaged Defendants in an effort to provide any information necessary for the delivery of the aircraft in conformity with the purchase agreements, expecting that Defendants had the will, intention, and ability to do so.

DALLAS COUNTY RECORDS Fax:2146537966        Dec 11 2009 11:23am  P019/023

5.24   Albatross and Fastwing will suffer substantial harm if the contract is not rescinded and its consideration returned, since the delivery of the aircraft will be delayed until next year. Damages would not adequately compensate for the loss of the bargain.

5.25   Plaintiffs will show that the conduct of Defendants as described in this petition was willful and/or malicious. As a result, plaintiffs are entitled to recover exemplary damages to deter Bombardier's active fraud upon other aircraft purchasers in the future.

**E.     Conversion:**

5.26   Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.25 of this petition as if set forth fully here.

5.27   Albatross and Fastwing owned, possessed, or had the right to immediate possession of the $8 Million in deposit payments made with Bombardier in advance of delivery of the green aircraft. Bombardier wrongfully exercised dominion or control over the deposits, and Albatross and Fastwing have suffered injury as a result. Bombardier has refused to return the deposits despite Plaintiffs' reasonable requests for their return in the original place of performance—Dallas, Texas—as reflected in "Exhibit C" and "Exhibit D." Further, as a result of Defendants' intentionally wrong acts, Albatross and Fastwing are entitled to the recovery of punitive damages.

**F.     Money Had and Received/Unjust Enrichment:**

5.28   Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.27 of this petition as if set forth fully here.

5.29   Bombardier has possession of the $8 Million in deposit payments made by Albatross and Fastwing in advance of the delivery of the green aircraft. The deposits belong to Albatross and Fastwing in equity and good conscience. Bombardier has refused to return such

DALLAS COUNTY RECORDS  Fax:2146537966        Dec 11 2009 11:24am  P020/023

deposits despite Plaintiffs' reasonable requests for their return in the original place of performance—Dallas, Texas—as reflected in "Exhibit C" and "Exhibit D." If Bombardier is allowed to continue its possession of such deposits, it will result in the unjust enrichment of Bombardier. Albatross and Fastwing have suffered injury as a result of Bombardier's refusal to return the deposits.

G.   **Conspiracy:**

5.30   Plaintiffs refer to and incorporate by reference the allegations contained in paragraphs 1.1 through 5.29 of this petition as if set forth fully here.

5.31   Plaintiffs allege that together Defendants conspired to defraud Plaintiffs and continue to exercise wrongful control over such deposits, and has refused to return such deposits despite Plaintiffs' reasonable requests for their return in the original place of performance— Dallas, Texas—as reflected in "Exhibit C" and "Exhibit D." Plaintiffs further allege that Defendants conspired to accomplish an unlawful purpose or a lawful purpose by unlawful means, and Defendants had a meeting of the minds on the object or course of action. Defendants committed an unlawful, overt act to further the object or course of action; and Plaintiffs have suffered injury as a proximate result of the wrongful act.

VI.   **Attorney Fees:**

6.1   Pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 38.001, Plaintiffs are entitled to and hereby seek the recovery of all reasonable and necessary attorney fees incurred in connection with the prosecution of this matter.

VII.   **Damages:**

7.1   Plaintiffs have suffered damages in excess of $3 million. Plaintiffs seek all losses sustained as a natural and proximate result of Defendants' wrongs, including the following:

---

DALLAS COUNTY RECORDS Fax:2146537966          Dec 11 2009 11:24am P021/023

a.   rescission of the Albatross and Fastwing aircraft purchase agreements;

b.   a return of any consideration paid by Plaintiffs in connection with the Albatross and Fastwing purchase agreements;

c.   all actual damages;

d.   all consequential damages;

e.   the amounts spent to mitigate Plaintiffs' damages;

f.   costs of court;

g.   pre-judgment interest;

h.   post-judgment interest;

i.   all reasonable and necessary attorneys' fees pursuant to TEX. CIV. PRAC. & REM. CODE ANN. §§ 38.001; and

j.   exemplary damages pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 41.003.

**VIII.   Conditions Precedent:**

8.1   All conditions precedent to Plaintiffs' recovery have been performed or have occurred.

**IX.   Jury Trial:**

9.1   Plaintiffs hereby request trial by jury.

**X.   Prayer:**

10.1   Plaintiffs pray that Defendants be cited to appear and answer herein and that upon trial, Plaintiffs have and recover from Defendants actual damages, consequential damages, exemplary damages, reasonable attorney's fees, prejudgment interest, post-judgment interest, costs of court and such other relief, at law and in equity, to which they may show themselves justly entitled.

**PLAINTIFFS' ORIGINAL PETITION**                                    Page 21

Respectfully submitted,

_____

Charles H. Smith
State Bar No. 18550500
Bryan S. David
State Bar No. 24031989
Tressie E. McKeon
State Bar No. 24055941
3030 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
(214) 740-4200
(214) 740-4242 - Telecopier

OF COUNSEL:

SMITH & MOORE PLLC
3030 Lincoln Plaza
500 N. Akard Street
Dallas, Texas 75201
(214) 740-4200
(214) 740-4242 - Telecopier

AND

Patrick Bailey
Bailey & Partners
2800 28th Street
Suite 200
Santa Monica, CA 90405
Phone: (310) 392-5000
Fax: (310) 392-8091

ATTORNEYS FOR PLAINTIFFS FASTWING
INVESTMENT HOLDING LTD.; and
ALBATROSS COMMERCIAL LTD